**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**
_____

No. 97-50584
_____


IN THE MATTER OF
H.L.S. ENERGY CO., INC.,

                                        Debtor.


STATE OF TEXAS,

                                        Appellee,

                VERSUS

            JOHN PATRICK LOWE,
                Trustee,

                                        Appellant.

_____

Appeal from the United States District Court
for the Western District of Texas
_____

August 28, 1998

Before JOLLY, SMITH, and BARKSDALE, Circuit Judges.

JERRY E. SMITH, Circuit Judge:


    At issue is the priority to be afforded a state's claim on a bankrupt estate, for costs incurred by the state in satisfaction of the estate's post-petition environmental obligations. Because we conclude that such costs are "actual, necessary costs and expenses of preserving the estate," see 11 U.S.C. § 503(b)(1)(A), we affirm

the district court's order that they be given priority as administrative expenses.

## I.

In 1991, H.L.S. Energy Co., Inc. ("HLS"), filed for bankruptcy reorganization under chapter 11. A large part of its assets consisted of operating interests in oil and gas wells in Texas, some of which were productive and some not. The chapter 11 trustee's basic plan of reorganization seems to have been to rid HLS's viable assets of the burden posed by its unviable ventures. This he achieved by selling off that which was profitable.

In 1994, once most or all of HLS's valuable assets had been sold, the bankruptcy proceeding was converted from a chapter 11 reorganization to a chapter 7 liquidation. In this appeal, the chapter 7 trustee, John Lowe, challenges the priority of a claim by the State of Texas arising out of the chapter 11 proceeding.

During the pendency of the chapter 11 proceeding, the state brought an informal enforcement action against the bankrupt estate in order to secure its compliance with certain environmental regulations. Specifically, the Texas Railroad CommissionSSwhich oversees all oil and gas production in the stateSSsought to require HLS to plug certain inactive oil wells in which HLS had the sole operating interest. The action was brought pursuant to 16 TEX. ADMIN. CODE § 3.9 (1998) (Tex. R.R. Comm'n, Plugging), which requires that "[p]lugging operations on each dry or inactive well must be

2

commenced within a period of one year after drilling or operations cease."[1]

The wells had ceased production at various dates, some before and some after initiation of the chapter 11 proceeding. None, however, had been inactive for more than one year prior to the bankruptcy.

At the time, the bankrupt estate had insufficient funds with which to plug the wells. After some negotiation, the chapter 11 trustee reached an agreement with the state whereby the state would plug the wells and charge the cost of plugging to the bankrupt estate. The state also agreed to waive substantial penalties that had accumulated while the wells remained unplugged. The cost to the state of plugging the wells was $41,808, for which it claimed reimbursement.

During the chapter 7 liquidation, the state asserted that its claim should be entitled to priority over those of other unsecured creditors under 11 U.S.C. § 503(b)(1)(A), as a necessary administrative expense. The trustee disputed this characterization. The bankruptcy court found, and the district court agreed, that the state's claim should be entitled to priority.

---

[1] *See also* TEX NAT. RES. CODE ANN. § 89.011 (Vernon 1978) ("The operator of a well shall properly plug the well when required and in accordance with the commission's rules"); TEX NAT. RES. CODE. ANN § 89.121(a) (granting enforcement authority to the Commission).

II.

A.

The state argues that in the proceedings below, the trustee waived his argument that the state's claim should not be entitled to priority. Having reviewed the record, we disagree.

Throughout the proceedings, the trustee consistently and steadfastly maintained that the state's claims should be entitled only to general unsecured status. The state makes much of the trustee's statement to the bankruptcy court that "if the Court is inclined to grant administrative expense status to this claim, it should be granted status only as a Chapter 11 administrative expense claim because that is consistent with the terms of the agreed order."

This statement is not a waiver. Rather, the initial caveat demonstrates that it is an argument in the alternative: Even if the claim were to receive chapter 11 priority, the trustee argued, it should not receive chapter 7 priority as well.[2] Consequently, the trustee's objection to the chapter 11 administrative expense status of the state's claim was not waived and is properly presented on appeal.

B.

---

[2] The question whether the claim should be entitled to chapter 7 priority is no longer in dispute, for it appears that there is enough money to pay all the chapter 11 administrative claims.

The state asserts that the terms of the Agreed Order conferred administrative priority on the state's claim, regardless of whether bankruptcy law would have so characterized its claim. This averment encounters two obstacles: First, it is far from certain that the Agreed Order purported to confer such priority status on the state's claim. Second, the trustee argues that he was never party to that order––after all, he had not even been appointed trustee––and cannot be bound thereby. The state responds that the creditors' committee was a party to the order and that, inasmuch as Lowe now challenges the state's priority on behalf of those creditors, he is bound by the acquiescence of his principals.

Rather than engage these arguments, we address the merits of whether this claim may be afforded administrative expense priority under the bankruptcy law. Because the state prevails on the merits, the terms and effect of the Agreed Order with regard to the administrative priority are of no consequence.

### III.

The Bankruptcy Code provides that "the actual, necessary costs and expenses of preserving the estate" are characterized as administrative expenses, 11 U.S.C. § 503(b)(1)(A) (1994), entitled to priority over the claims of other unsecured creditors, *id.* § 507(a)(1) (1994). In *Reading Co. v. Brown*, 391 U.S. 471, 485 (1968), the Court provided an expansive interpretation of what is

5

an "actual, necessary cost" entitled to priority, holding that damages in negligence to a third party arising out of the receiver's administration of the estate give rise to an "actual and necessary cost." "It is theoretically sounder . . . to treat tort claims arising during [a bankruptcy] arrangement as actual and necessary expenses of the arrangement rather than debts of the bankrupt." *Id*. at 483.

*Reading* has survived subsequent revisions to the Code, as the underlying statutory provision was left essentially unchanged. *See In re Al Copeland Enters.*, 991 F.2d 233, 239 (5th Cir. 1993). The question is whether *Reading* and § 503(b)(1)(A) apply here to characterize the state's claims as administrative expenses, imbued with priority status.

An "actual and necessary cost" must have been of benefit to the estate and its creditors. *See, e.g., In re Transamerican Natural Gas Corp.*, 978 F.2d 1409, 1416 (5th Cir. 1992). This requirement is in keeping with the conceptual justification for administrative expense priority: that creditors must pay for those expenses necessary to produce the distribution to which they are entitled. *See* 3 DANIEL R. COWAN, BANKRUPTCY LAW AND PRACTICE § 12.23(e)(1), at 83 (6th ed. 1994). "That is, the costs of salvage are to be paid." *Id*. The "benefit" requirement has no independent basis in the Code, however, but is merely a way of testing whether a particular expense was truly "necessary" to the

6

estate:  If it was of no "benefit," it cannot have been "necessary."  *See* LAWRENCE P. KING, ED., 4 COLLIER ON BANKRUPTCY ¶ 503.06[3][b] (15th rev. ed. 1998).

The trustee argues that the costs incurred by the state in connection with plugging the unproductive wells did not "benefit" the estate.  Of course this is true§§in the sense that the bankrupt estate and its creditors would have been happy to abandon the unproductive wells, leaving them unplugged in abdication of HLS's obligations under Texas law.  But bearing in mind that the "benefit" requirement is simply a gloss on the underlying concept of what is "necessary," our notion of "benefit" cannot be limited to the narrow sense that the trustee urges.

Under federal law, bankruptcy trustees must comply with state law.  *See* 28 U.S.C. § 959(b).  Furthermore, a bankruptcy trustee may not abandon property in contravention of a state law reasonably designed to protect public health or safety.  *See Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Protection*, 474 U.S. 494, 507 (1986).  And there is no question that under Texas law, the owner of an operating interest is required to plug wells that have remained unproductive for a year.[3]  *See* 16 TEX. ADMIN. CODE § 3.9 (1998) (Tex. R.R. Comm'n, Plugging).  Furthermore, because the

---

[3] The trustee asserts that the obligation to plug a well arises as soon as it becomes unproductive.  He is incorrect as a matter of law.  Operators are required to commence plugging within a year of the cessation of production.  *See* TEX. NAT. RES. CODE ANN. § 89.011; 16 TEX. ADMIN. CODE § 3.9.  Thus, prior to the passage of one year he may plug the wells, but after the passage of that year, he is in violation if he does not.

7

wells became inactive post-petition or after a year prior to the petition, the plugging obligations on these wells accrued post-petition. *See id*. Thus, a combination of Texas and federal law placed on the trustee an inescapable obligation to plug the unproductive wells, an obligation that arose during the chapter 11 proceedings.

The fulfillment of this, the estate's obligation, can only be seen as a benefit to the estate. In this sense, the state's action resembles the sort of "salvage" work that lies at the heart of the administrative expense priority. No one would challenge the expense of shoring up the sagging roof on a bankrupt's warehouse, for example, where carpentry was needed to prevent further damage to the structure or liability from injury to passers-by. *Cf., e.g.*, 4 King, *supra*, ¶ 503.06[1] (examples of "proper" expenditures including repairs and upkeep). The laws of Texas compelled action in this case just as surely as would the laws of physics in that one. The unplugged unproductive wells operated as a legal liability on the estate, a liability capable of generating losses in the nature of substantial fines every day the wells remained unplugged.

This case is not unlike our decision in *Al Copeland*, in which the chapter 11 debtor had failed to remit sales tax revenues it had collected and were due to the state under Texas law. Furthermore, Texas law required the debtor to pay interest on revenues collected

8

that remained unpaid.  Because the trustee was required to manage the estate in accordance with state law, *see* 28 U.S.C. §§ 959(b) and 960, it had been required *ab initio* to remit the tax revenues. Therefore, the interest that accrued as a result of his post-petition decision not to pay was an administrative expense: an "actual and necessary cost" comparable to the "damages resulting from the negligence of the receiver" in *Reading*.  *See Al Copeland*, 991 F.2d at 238-240 (quoting *Reading*, 391 U.S. at 485).

Just as the *Al Copeland* trustee was obligated under Texas law to remit the sales tax revenues, the trustee here was obligated plug the wells.[4]  The failure of the trustee in *Al Copeland* to fulfill his state law obligations resulted in further liability under state law, liability that was given priority as an administrative expense.  Similarly, the instant trustee's failure to plug the wells resulted in the state's action in plugging them, an action for which the bankrupt estate was obligated to pay. This, too, must be given priority.

### IV.

The trustee contends that the the chapter 11 trustee never

---

[4] In fact, there is reason to believe that the decision to cease production on the wells was an economic one:  The wells had been depleted to the point at which they cost more to operate than they produced revenue.  Thus, the trustee likely could have avoided the need to plug the wells by resuming production, but made a rational economic calculation to cease production.  Such a calculation, however, must include the cost of plugging operations as a cost of ceasing production.

9

"operated" the wells so as to render costs associated with the wells of benefit to or necessary to his management of the estate. Again, Texas law directly dictates otherwise.

Of course, the chapter 11 trustee never did anything with the wells:  The whole point of this case is that he neither produced oil from nor plugged them.  Still, the bankrupt estate possessed the sole operating interest in the wells.   Anyone possessing the sole operating interest in an unproductive well surely would be happy to abandon that interest, and the concomitant obligation to plug that well.  But he cannot, for  Texas law requires well operators to plug their wells when they are finished with production.  *See* TEX. NAT. RES. CODE ANN. § 89.011.

It therefore matters not whether the bankrupt estate produced any oil or received any revenue from the wells.  As the operator, it was required to plug them.


V.

Because the plugging requirement here accrued post-petition, we need not reach the question whether post-petition expenses for the remediation of pre-petition environmental liabilities would likewise constitute an administrative expense.  But because we conclude that the cost of plugging the wells in accordance with Texas law was an "actual and necessary cost" of managing the estate, we agree that such cost must be afforded priority as an

10

administrative expense.  The order granting priority is AFFIRMED.