# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 18-30940

United States Court of Appeals
Fifth Circuit

**FILED**
July 26, 2019

Lyle W. Cayce
Clerk

In the Matter of:  WHISTLER ENERGY II, L.L.C.,

      Debtor

NABORS OFFSHORE CORPORATION,

      Appellant

v.

WHISTLER ENERGY II, L.L.C.; APOLLO FRANKLIN PARTNERSHIP, L.P.; APOLLO CENTRE STREET PARTNERSHIP, L.P.; APOLLO SPECIAL OPPORTUNITIES MANAGED ACCOUNT, L.P.; APOLLO CREDIT OPPORTUNITY FUND III AIV I LP; ANS HOLDINGS WE, LIMITED; APOLLO MANAGEMENT, L.P.; OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF WHISTLER ENERGY II, L.L.C.,

      Appellees

Appeal from the United States District Court
for the Eastern District of Louisiana

Before OWEN, SOUTHWICK, and HIGGINSON, Circuit Judges.

STEPHEN A. HIGGINSON, Circuit Judge:

This appeal arises out of the Chapter 11 bankruptcy proceeding of Whistler Energy II, L.L.C. Whistler owns an oil and gas production platform in the Outer Continental Shelf in the Gulf of Mexico. In 2014, it contracted

No. 18-30940

with Nabors Offshore Corporation to provide a drilling rig and related equipment and services on the Whistler platform. Whistler later entered bankruptcy proceedings and rejected the drilling contract. Nabors's personnel and equipment nonetheless were present on the platform for several months pending the preparation of a demobilization plan and regulatory approval.

Nabors then sought administrative priority in the bankruptcy proceeding for expenses incurred after the rejection of its contract. The bankruptcy court granted this request in part and denied it in part. Nabors appealed, and the district court affirmed. After clarifying the scope and definition of administrative expenses, we remand for reconsideration.

## I.

The relationship between Whistler and Nabors had three major phases: (1) the contract period; (2) the pre-demobilization period; and (3) the demobilization period. This dispute centers on the last two time periods.

## A.

Whistler entered into a drilling contract with Nabors in February 2014, with the goal of drilling two new wells. Under this contract, Nabors provided a drilling rig, engines and generators, a crane, living quarters, and crew members to operate the equipment. The contract was later amended to include additional cranes and living quarters. Nabors charged a daily rate for its equipment and services. Whistler was already producing other oil and gas wells on its platform and these production activities were independent of Nabors's drilling operation.

Nabors completed the first of two wells for Whistler in October 2015. Work then began on the second well, known as the A-13 well. On March 10, 2016, a Nabors employee died in an accident on the Whistler platform. The U.S. Bureau of Safety and Environmental Enforcement (BSEE) immediately ordered both Nabors and Whistler to stop drilling activity. BSEE permitted

No. 18-30940

Whistler to continue producing its existing wells. BSEE also issued a preservation order requiring Whistler and Nabors to preserve information and physical materials relevant to the accident. Whistler later decided to temporarily abandon the A-13 well, and BSEE approved this decision. Between June 14 and June 20, Nabors undertook the necessary measures to temporarily abandon the A-13 well. Whistler paid Nabors for this work at the contract rate.

During this same time period, Whistler entered bankruptcy proceedings. On March 24, 2016, several of Whistler's creditors filed an involuntary bankruptcy petition under Chapter 11 of the Bankruptcy Code. Whistler's primary secured creditor is a group of related lenders ("Apollo"). Whistler consented to entry of an order of relief on May 25, and Whistler became the Chapter 11 debtor-in-possession. *See* 11 U.S.C. § 1101(1). On June 17, Nabors filed a motion in bankruptcy court to compel assumption or rejection of the drilling contract. Whistler responded on June 20, indicating that it was electing to reject the contract. On July 20, the bankruptcy court held that the contract was rejected effective June 20, 2016.

B.

With the rejection of the drilling contract, the parties entered the pre-demobilization period. By June 20, Nabors was no longer conducting any drilling operations. Yet Nabors's rig, equipment, and some personnel continued to be present on the Whistler platform. Removing all this equipment from an offshore platform in the Gulf of Mexico was not a simple task. On July 25, Whistler sent a letter to Nabors asking it to provide a demobilization plan. The letter stated that Whistler would "cooperate with Nabors and facilitate an orderly demobilization of the Nabors Rig while ensuring that there is no disruption to Debtor's production operations on the platform." Nabors submitted a demobilization plan on September 8. The bankruptcy court found that this "plan was required by and had to be approved by BSEE."

No. 18-30940

On October 4, Whistler notified BSEE that it planned to remove the Nabors rig from the platform and requested that the preservation order be waived or terminated to permit demobilization. That same day, BSEE released Whistler and Nabors from the preservation order, except as to certain documents related to the accident. On October 5, Whistler sought a "production shut-in departure" from BSEE. This departure, or waiver, was necessary to allow Whistler to continue producing oil and gas from its existing wells while demobilization was in progress.[1] BSEE approved the waiver on October 20, and demobilization commenced that day.

As a result of this lengthy pre-demobilization process, Nabors remained on the Whistler platform for several months after the rejection of its contract. The bankruptcy court explained that, during this time, "Nabors' personnel were on the rig maintaining Nabors' equipment, although there was no drilling activity being performed." Further, the bankruptcy court found that Whistler "used some services provided by Nabors," including "among other things, the use of the crane and the crane operator, the living quarters supplied by Nabors for the use of Whistler's crew, and labor charges for tasks Whistler requested the Nabors' crew perform." According to Nabors, its personnel also attended daily meetings presided over by Whistler and drafted daily reports for Whistler's approval. Whistler contends, however, that these daily reports reflect that Nabors's crew members spent most of their time waiting and maintaining their own equipment.

C.

On October 20, Nabors began the demobilization process. The bankruptcy court found that, by this time, the work needed to temporarily

---

[1] According to bankruptcy court filings, Whistler averaged about $2.1 million in net monthly revenue from oil and gas production.

abandon the A-13 well was completed and the well was in compliance with BSEE regulations. Demobilization primarily involved dismantling and removing the Nabors rig and other equipment from the Whistler platform. Nabors asserts that it also installed Whistler's cranes and demobilized third-party contractor equipment at Whistler's request. Whistler represents that it agreed to pay Nabors for the crane installation, and that the third-party contractors were responsible for their own costs. Demobilization was completed by December 13, 2016.

## D.

Unsurprisingly, this complex undertaking came at considerable expense. Hoping to recover its costs on a priority basis, Nabors asked the bankruptcy court to classify its pre-demobilization and demobilization expenses as administrative expenses under 11 U.S.C. § 503(b)(1)(A). This statutory provision grants priority status to certain necessary expenses incurred after the filing of a bankruptcy petition that benefit the bankruptcy estate. *Id.*; § 507(a)(2). Nabors requested administrative priority for $4.32 million in pre-demobilization expenses and $2.65 million in demobilization costs. Whistler, Apollo, and the Official Committee of Unsecured Creditors objected to the majority of Nabors's request, although Whistler acknowledged that Nabors was entitled to administrative priority for the cost of certain specific services that Whistler requested and used during the pre-demobilization period.

The bankruptcy court held a four-day hearing and heard extensive testimony regarding Nabors's claim for administrative expenses. In its order, the court found it "clear that at a minimum, Nabors has a general unsecured claim against the bankruptcy estate in the amounts it seeks." But the bankruptcy court rejected Nabors's argument that this entire amount was entitled to administrative priority. With regard to the pre-demobilization period, the court reasoned that "administrative priority status only applies to

a claim based on the portion actually used by the debtor-in-possession." The bankruptcy court then found that, "with the exception of the services specifically requested by the debtor-in-possession during this time (and which the debtor-in-possession agrees that it asked for and has agreed to pay for), the services provided are akin to Nabors being *available* to provide services, as opposed to Nabors *actually providing* services to the debtor-in-possession." The court further concluded that Whistler did not induce any other pre-demobilization performance by Nabors.

The bankruptcy court denied any priority to Nabors's demobilization expenses, explaining that demobilization was simply the consequence of the rejection of the contract and did not benefit the bankruptcy estate. Nabors ultimately received an administrative priority claim in the amount of $897,024 and a general unsecured contract rejection damages claim in the amount of $6,070,902. Nabors filed a motion for reconsideration, which the bankruptcy court denied. The district court affirmed the bankruptcy court's order, noting that "[a]lthough there is evidence that Nabors provided, and Whistler used, additional materials and services after the bankruptcy petition was filed, there is no evidence that Whistler requested their use." The district court also rejected Nabors's argument that demobilization was necessary to ensure compliance with Whistler's regulatory obligations. Nabors now appeals.

## II.

"We review the decision of the district court by applying the same standard to the bankruptcy court's findings of fact and conclusions of law as the district court applied." *In re Jack/Wade Drilling, Inc.*, 258 F.3d 385, 387 (5th Cir. 2001). "Acting as a second review court, we review a bankruptcy court's legal conclusions *de novo* and its findings of fact for clear error." *In re Glenn*, 900 F.3d 187, 189 (5th Cir. 2018) (quotation omitted).

No. 18-30940

In bankruptcy proceedings, "administrative expenses" are granted priority over most unsecured claims. *See* 11 U.S.C. § 507(a)(2). This classification is significant because we presume that all "creditors are equally innocent victims in this bankruptcy." *Jack/Wade Drilling, Inc.*, 258 F.3d at 389. The question is therefore "not whether [the creditor] deserves to get paid, but whether [it] deserves to get paid at the expense of [the debtor's] existing unsecured creditors." *Id.* The claimant seeking administrative expenses bears the burden of proof. *In re TransAmerican Nat. Gas Corp.*, 978 F.2d 1409, 1416 (5th Cir. 1992).

As relevant here, administrative expenses include "the actual, necessary costs and expenses of preserving the estate including . . . wages, salaries, and commissions for services rendered after the commencement of the case." § 503(b)(1)(A). "[T]o qualify as an 'actual and necessary cost' under section 503(b)(1)(A), a claim against the estate must have arisen post-petition and as a result of actions taken by the trustee [or debtor-in-possession] that benefitted the estate." *Jack/Wade Drilling, Inc.*, 258 F.3d at 387. We elaborate on this standard below.

A.

The requirement that expenses arise "post-petition and as a result of actions taken by the" debtor-in-possession, *id.*, is closely tied to the purpose of section 503(b)(1)(A). This subsection is designed to address a specific business problem. Once bankruptcy proceedings are underway, "[t]hird parties might refuse to extend credit to debtors-in-possession for fear that their claims would not be paid." *TransAmerican Nat. Gas Corp.*, 978 F.2d at 1416 (quotation omitted). An inability to secure credit is likely to harm the debtor-in-possession's business and, by extension, its creditors. *Id.* Administrative priority serves "to encourage third parties to provide necessary goods and services to the debtor-in-possession so that it can continue to conduct its

7

business, thus generating funds from which prepetition creditors can be paid." *Id.* at 1420; *see also In re Jartran, Inc.*, 732 F.2d 584, 590 (7th Cir. 1984) (explaining that section 503 creates "a practical incentive to achieving reorganization for the benefit of all creditors").

This incentive is not required, however, when the relevant obligation pre-dates the bankruptcy or when the debtor-in-possession does not want or need the services at issue. For this reason, an administrative priority claim "must have arisen from a transaction with the debtor in possession," as opposed to the pre-petition debtor. *In re Phones for All, Inc.*, 288 F.3d 730, 732 (5th Cir. 2002) (quoting *In re Commercial Fin. Servs., Inc.*, 246 F.3d 1291, 1294 (10th Cir. 2001)). Further, in the context of commercial transactions for goods and services, a creditor must show some inducement by the debtor-in-possession. *See Jartran*, 732 F.2d at 587; *see also Commercial Fin. Servs.*, 246 F.3d at 1294; *In re Mammoth Mart, Inc.*, 536 F.2d 950, 954 (1st Cir. 1976).

Determining whether the debtor-in-possession induced post-petition services is often a straightforward inquiry. For instance, the Bankruptcy Code makes clear that a debtor-in-possession's rejection of a pre-petition contract does not give rise to an administrative priority claim. Instead, this contract rejection is treated as a breach of contract "immediately before the date of the filing of the petition." 11 U.S.C. § 365(g)(1); *see also* § 502(g). This makes sense, as a pre-petition contract does not implicate the concerns underlying section 503(b)(1)(A). *See, e.g., Jartran*, 732 F.2d at 586 (noting that § 503 priority is necessary because "presumably no creditor would willingly assume the status of a non-priority creditor to a debtor undergoing reorganization"). On the other end of the spectrum, it is similarly clear that a written post-petition agreement between a debtor-in-possession and a creditor constitutes inducement by the debtor-in-possession. *See, e.g., In re Airlift Int'l, Inc.*, 761 F.2d 1503, 1509 (11th Cir. 1985) (explaining that a breach of a post-petition contract is entitled to

administrative priority because "[t]he debtor in possession or trustee by assuming or entering into the contract makes a determination that the contract is in the best interest of the estate and its creditors").

Yet post-petition business relationships are not always so clearly defined. Here, Whistler and Nabors continued working together after the rejection of the drilling contract but did not enter into a new written agreement.[2] Although an explicit post-petition agreement is certainly helpful, neither party argues that it is the *only* way to establish that expenses were incurred as "a result of actions taken by the" debtor-in-possession. *Jack/Wade Drilling*, 258 F.3d at 387. To the contrary, Whistler acknowledges—and the bankruptcy court held—that Nabors is entitled to administrative priority for certain services Whistler requested and used during the pre-demobilization period. Further, the legal authority relied on by Whistler does not support the view that inducement should be narrowly defined to require an explicit request by the debtor-in-possession for specific services.

Consistent with the decisions of our sister circuits, we hold that a creditor can establish that its expenses are attributable to the actions of the bankruptcy estate through evidence of either a direct request from the debtor-in-possession or other inducement via the knowing and voluntary post-petition

---

[2] Whistler appears to suggest that there should be a presumption against recognizing claims for administrative expenses following the rejection of a contract. To the extent Whistler makes this argument, we do not believe such a presumption is consistent with the text or purposes of section 503. A debtor-in-possession might wish to reject a burdensome contract but—as was the case here—continue to receive more limited services from the same service provider. *See, e.g., In re Home Interiors & Gifts, Inc.*, Nos. 08-31961, 08-3125, cccc, *8 (Bankr. N.D. Tex. Oct. 9, 2008) (holding that a trademark holder is entitled to administrative priority for the post-rejection use of its mark "because the post-rejection use claim does not arise from rejection; rather, it arises from the debtor's decision to continue to use the property notwithstanding its rejection of the lease"). Such continuing business relationships may bring important efficiency benefits to the bankruptcy estate. The creditor, of course, retains the burden to satisfy the administrative priority standard. *TransAmerican Nat. Gas Corp.*, 978 F.2d at 1416.

acceptance of desired goods or services. *See Mammoth Mart*, 536 F.2d at 955 (explaining that "[w]hen the debtor-in-possession . . . accepts services from a third party without paying for them, the debtor-in-possession itself caused legally cognizable injury, and the resulting claims for compensation are entitled to first priority"); *see also Commercial Fin. Servs.*, 246 F.3d at 1295 (noting that employees received full compensation for their post-petition services); *Jartran*, 732 F.2d at 588 ("[P]resumably, if the debtor had used one of the airline tickets after the petition was filed, the airline would have been entitled to administrative priority.").

## B.

In addition to arising "post-petition and as a result of actions taken by the" debtor-in-possession, the administrative expenses claimed must benefit the estate. *Jack/Wade Drilling*, 258 F.3d at 387. This requirement "is merely a way of testing whether a particular expense was truly 'necessary' to the estate: If it was of no 'benefit,' it cannot have been 'necessary'" within the meaning of § 503(b)(1)(A). *In re H.L.S. Energy Co., Inc.*, 151 F.3d 434, 437 (5th Cir. 1998); *see also TransAmerican Nat. Gas Corp.*, 978 F.2d at 1416 (The words 'actual' and 'necessary' have been construed narrowly: the debt must benefit the estate and its creditors.") (cleaned up). We focus on the benefit to the estate, not the loss to the creditor. *See id.* at 1419–20 (citing *In re Strause*, 40 B.R. 110, 113 (Bankr. W.D. Wis. 1984)).

A benefit to the estate can come in different forms. While "the amount to be allowed as an administrative expense must be measured in dollars and cents, (thus satisfying § 503(b)(1)'s requirement that the costs or expenses be 'actual'), the question whether the estate has been benefited cannot be so narrowly confined." *Id.* at 1420. "Although the estate receives a benefit that often can be measured by the actual cost of necessary goods or services supplied, the estate also receives other less readily calculable benefits, such as

the ability to continue to conduct business as usual." *Id.* Thus, "'actual and necessary costs' should include costs ordinarily incident to operation of a business, and not be limited to costs without which rehabilitation would be impossible." *Reading Co. v. Brown,* 391 U.S. 471, 483 (1968).

When certain goods or services will benefit the bankruptcy estate, administrative priority enables the debtor-in-possession to transact for that benefit in the same manner as a solvent enterprise. This requires paying the full and ordinary cost of such goods and services, including overhead and incidental expenses. Absent full payment, creditors would have little incentive to do business with the debtor-in-possession. If a debtor-in-possession decides to rent equipment for its business, for example, it cannot later evade those rental payments by asserting that it did not end up needing the equipment after all. *See Airlift Int'l*, 761 F.2d at 1510 (noting that mortgagees "cannot be expected to forego their right of repossession unless they are guaranteed payment by the terms of the agreement during the time the aircraft remains in the possession of the debtor"); *Kimzey v. Premium Casing Equip., LLC*, No. 16-1490, 2018 WL 1321971, at *7 (W.D. La. March 14, 2018) (holding that, because the debtor-in-possession "made an affirmative business decision" to retain certain equipment, "[t]he fact that the two local managers . . . did not take advantage of the available equipment is immaterial"). Nor can a debtor-in-possession "argue that a specific line item expense that goes into providing a service did not directly benefit the estate." *In re ATP Oil & Gas Corp.*, No. 12-36187, 2014 WL 1047818, at *9 (Bankr. S.D. Tex. March 18, 2014).

The bankruptcy court in this case drew a sharp distinction between "Nabors being *available* to provide services" through its presence on the platform and the direct costs of "Nabors *actually providing* services to" Whistler. Yet conducting business as usual often requires that certain goods or services be available, even if ultimately not used. Insurance coverage, for

No. 18-30940

example, benefits the debtor-in-possession by minimizing the risk of unexpected and potentially catastrophic expenses. *See Reading Co.*, 391 U.S. at 483 ("It is of course obvious that proper insurance premiums must be given priority, else insurance could not be obtained."). Similarly, a business may benefit from having certain equipment on hand in case it is needed. *See Airlift Int'l*, 761 F.2d at 1510–11 (noting that the ability to use a mortgaged aircraft was critical to the debtor-in-possession's business); *Kimzey*, 2018 WL 1321971, at *7 (finding that the debtor-in-possession benefited from the retention of leased equipment through its "increased capacity to respond to potential customer demand" and back-up capacity if other equipment "experienced mechanical problems"). Thus, we clarify that when the debtor-in-possession induces availability and the bankruptcy estate derives a benefit from it, the ordinary cost of ensuring such availability qualifies as an administrative expense.

## III.

Nabors seeks $4.32 million in administrative expenses for the pre-demobilization period. This amount reflects the drilling contract rate of $45,000 per day for the early part of the period, and a reduced non-contract rate of $28,000 per day beginning in July 2016, when Nabors reduced the number of personnel on the platform. Nabors argues that it is entitled to administrative priority for two interrelated reasons: (1) Whistler required Nabors to delay demobilization until Whistler could obtain the necessary BSEE approvals and avoid disruption to its production operations; and (2) Nabors provided, and Whistler accepted, additional services not fully compensated by the bankruptcy court's administrative expenses calculation.

## A.

We first address Nabors's ongoing presence on the Whistler platform. It appears undisputed that Nabors incurred significant expenses by staying on

the platform until October 20, 2016.[3] Nabors had to maintain its equipment, including cranes used by Whistler, and several Nabors crew members were present on the platform throughout this period. The bankruptcy court found that Nabors was entitled to at least an unsecured damages claim for its pre-demobilization expenses.

The question presented here is whether these expenses meet the standard for administrative priority. The parties forcefully contest whether Whistler as debtor-in-possession *induced* Nabors's ongoing availability on the platform and whether Nabors's extended presence benefited the bankruptcy estate. We conclude that this dispute rests on factual issues that must be addressed by the bankruptcy court in the first instance. Specifically, it is not clear from the record why demobilization did not begin until October 20, 2016. Nabors asserts that Whistler required it to remain on the platform pending BSEE approval and that demobilization began as soon as BSEE approved the production shut-in waiver. Whistler contends, contrastingly, that it asked Nabors to leave the platform immediately and that Nabors delayed submitting a demobilization plan.

The bankruptcy court did not resolve this question. Although the court concluded that Nabors did not demonstrate "that it was induced to stay and perform under the contract after the June 20, 2016 rejection date," it also made factual findings that "Whistler requested that Nabors provide it with a demobilisation plan," this "plan was required by and had to be approved by

---

[3] Whistler asserts that Nabors benefited from "rent-free 'parking' of its equipment" on the platform during the pre-demobilization period. As Whistler acknowledges, the bankruptcy court made no factual findings to this effect. Regardless, we focus on whether Nabors incurred expenses that benefited the bankruptcy estate, not on suppositions about whether or not Nabors had alternative business opportunities. *See TransAmerican Nat. Gas Corp.*, 978 F.2d at 1419.

BSEE," and the timing of demobilization "was at least in part because care had to be taken not to interfere with Whistler's ongoing production operations."

The bankruptcy court's administrative expenses determination appears to have been influenced by its stated view that Nabors's mere availability on the platform did not warrant administrative priority. Consistent with this position, Whistler contends that most of Nabors's pre-demobilization expenses are attributable to "waiting," and waiting did not benefit the estate. Yet, as explained above, availability (or waiting) can benefit the debtor-in-possession. Here, the bankruptcy court found that Whistler requested that Nabors prepare a demobilization plan and needed Nabors to await BSEE approval before commencing demobilization.[4] Had Nabors removed its equipment and personnel immediately upon rejection of the contract, without permitting Whistler time to apply for a production shut-in waiver, this would have disrupted Whistler's lucrative "ongoing production operations."

Whereas Nabors would be entitled to administrative priority for the actual and necessary costs of its presence on the platform for the period of time required to satisfy Whistler's logistical and regulatory requirements, Nabors would not be entitled to administrative expenses for the cost of its presence on the platform for any time attributable to its own unnecessary delay, as such delay neither results from actions by the debtor-in-possession nor benefits the estate. The bankruptcy court did not make determinative factual findings as to each party's responsibility for the length of the pre-demobilization period, and we will not do so for the first time on appeal. We therefore remand for the bankruptcy court to determine, in light of the legal standard clarified above,

---

[4] The bankruptcy court stated that, "Once approval was obtained, Whistler commenced on October 20 to dismantle and remove its rig from Whistler's platform." The first reference to Whistler in this quoted passage appears to be an error, as it was Nabors rather than Whistler that demobilized its rig from the Whistler platform.

No. 18-30940

(1) whether Whistler induced Nabors to stay on the platform; (2) the length of time Nabors stayed on the platform because of Whistler's post-petition needs; and (3) the actual and necessary costs of staying on the platform during this time period. *See In re DP Partners Ltd. P'ship*, 106 F.3d 667, 673 (5th Cir. 1997) (explaining that the bankruptcy court must "scrutinize claimed expenses for waste and duplication to ensure that expenses were indeed actual and necessary").

## B.

In addition to its presence on the platform, Nabors asserts that it is entitled to administrative expenses for the cost of providing services to Whistler during the pre-demobilization period. Whistler acknowledges that it requested certain services necessary to its ongoing operations, including the "use of the crane, use of the living quarters, use of a crane operator, and use of Nabors' personnel as needed." The bankruptcy court held that Nabors was entitled to "administrative priority for the post-rejection work actually requested by Whistler." The court acknowledged that Nabors performed maintenance work on its equipment but, as noted, concluded "that with the exception of the services specifically requested by the debtor-in-possession during this time (and which the debtor-in-possession agrees that it asked for and has agreed to pay for), the services provided are akin to Nabors being *available* to provide services, as opposed to Nabors *actually providing* services to the debtor-in-possession."

The parties offer distinct interpretations of the bankruptcy court's findings. Nabors asserts that the bankruptcy court applied an overly stringent inducement standard to require an actual request for specific services and thus did not consider other necessary post-petition services accepted by Whistler. For example, Nabors contends that it could not have provided crane services or housing units to Whistler without also performing regular maintenance on

No. 18-30940

its cranes and generators. Whistler maintains, however, that the bankruptcy court applied the proper legal standard but implicitly determined that the only services accepted and used by Whistler were those it specifically requested.[5] As noted above, the district court appears to have interpreted the bankruptcy court's order differently, stating that "there is evidence that Nabors provided, and Whistler used, additional materials and services after the bankruptcy petition was filed," but "no evidence that Whistler requested their use."

Because we must remand for further factual determinations regarding Nabors's presence on the platform, we leave it to the bankruptcy court to clarify its own findings regarding Nabors's provision of services. As stated above, Nabors is entitled to administrative priority for those services either explicitly requested by the debtor-in-possession or knowingly and voluntarily accepted after the filing of a bankruptcy petition. *See Mammoth Mart*, 536 F.2d at 955. Administrative expenses should include the full and ordinary costs of providing a service, including overhead costs and other indirect expenses.[6]

## IV.

Finally, Nabors requests administrative priority for $2.65 million in demobilization costs. This amount is based on the $63,000 daily rate provided in the drilling contract. The bankruptcy court denied this request in full, concluding that demobilization was simply the consequence of Whistler's decision to reject the contract and did not benefit the bankruptcy estate. We agree.

---

[5] Notably, Whistler's own briefing at times suggests that the bankruptcy court did require that services be actually requested to qualify for administrative priority.

[6] Some of these costs may overlap with the actual and necessary expenses of remaining on the platform. Nabors, of course, is not entitled to double recovery of such costs. *See DP Partners Ltd. P'ship*, 106 F.3d at 673.

16

No. 18-30940

A.

Nabors asserts that demobilization benefited Whistler because it was necessary to satisfy Whistler's regulatory obligations. A debtor-in-possession must comply with applicable health and safety laws, and services rendered to fulfill these legal requirements are a necessary expense that benefits the bankruptcy estate. *See H.L.S. Energy Co.*, 151 F.3d at 438; *see also Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 507 (1986). Whistler accepts this standard but contends that it was under no legal obligation to undertake demobilization.

In support of its view that Whistler was required to demobilize its rig, Nabors relies on 30 C.F.R. § 250.1703.[7] This BSEE regulation provides, in relevant part:

> **What are the general requirements for decommissioning?**
>
> When your facilities are no longer useful for operations, you must:
>
> (a) Get approval from the appropriate District Manager before decommissioning wells and from the Regional Supervisor before decommissioning platforms and pipelines or other facilities;
>
> (b) Permanently plug all wells . . .
>
> (c) Remove all platforms and other facilities, except as provided in §§ 250.1725(a) and 250.1730.
>
> (d) Decommission all pipelines . . . .

Nabors argues that its rig qualifies as a "facility" under the BSEE regulations, and that Whistler was required to remove it as soon as the rig was no longer

---

[7] Nabors also points to Whistler's obligation to ensure that all operations on the platform are conducted in a safe manner, but it has not demonstrated how this general safety requirement relates to its demobilization expenses.

useful to Whistler's operations.[8] Whistler contends that § 250.1703 applies only upon decommissioning of the platform, and is not relevant here. "Decommissioning means: (1) Ending oil, gas, or sulphur operations; and (2) Returning the lease or pipeline right-of-way to a condition that meets the requirements of regulations of BSEE and other agencies that have jurisdiction over decommissioning activities." *Id.* § 250.1700(a). Whistler represents that it has no plans to decommission the platform.

By its plain terms, § 250.1703 applies to decommissioning operations, not to the removal of an unneeded rig from a working platform. The listed requirements, such as permanently plugging all wells and decommissioning all pipelines, contemplate a full decommissioning. The title of the regulation, which references decommissioning requirements, further indicates that it relates only to decommissioning. *See Yates v. United States*, 135 S. Ct. 1074, 1083 (2015); *see also Tetra Tech., Inc. v. Cont'l Ins. Co.*, 814 F.3d 733, 746 n.65 (5th Cir. 2016) (noting that § 250.1703 lists the general requirements for decommissioning). This interpretation is also consistent with the purpose of the regulation. Full removal of the platform and other facilities upon decommissioning is necessary in part because "the presence of idle platforms may harm navigation safety" and, "if not removed in a timely manner, an idle platform can become a financial liability if subsequently destroyed or damaged in a future event such as a hurricane." *Cutting Underwater Tech. USA, Inc. v. Eni U.S. Operating Co.*, 671 F.3d 512, 520 (5th Cir. 2012) (cleaned up). These concerns do not apply with the same force to an idle piece of equipment on an operational platform.

---

[8] A "facility" is defined as "any installation other than a pipeline used for oil, gas, or sulphur activities that is permanently or temporarily attached to the seabed on the OCS." *Id.* § 250.1700(c).

No. 18-30940

Nabors argues in the alternative that Whistler would eventually be required to demobilize the rig because it will one day decommission the platform. Yet this obligation would arise only if Nabors chose to abandon its rig and other equipment on the Whistler platform. The mere possibility that Whistler could have future regulatory obligations is insufficient to give rise to administrative priority. *See Midlantic Nat'l Bank*, 474 U.S. at 507 & n.9 (holding that a trustee cannot abandon property in violation of state health or safety laws, but that this "does not encompass a speculative or indeterminate future violation of such laws that may stem from abandonment"); *Allen Care Centers Inc.*, 96 F.3d 1328, 1331 (9th Cir. 1996) ("[A]dministrative expense priority is not available for expenditures merely because they avert *potential* tort liability—it must appear that actual benefit accrued to the estate." (emphasis added)). We therefore conclude that demobilization was not necessary to satisfy the bankruptcy estate's legal obligations.

B.

Nabors also contends that Whistler benefited from demobilization because Whistler requested changes to the demobilization plan. We have no trouble concluding that, if Nabors modified its demobilization plan to accommodate Whistler's requirements, then it would be entitled to administrative priority for the actual and necessary costs of such modifications. But Nabors has not identified any specific added expenses that have gone uncompensated.[9] Instead, Nabors argues that it is entitled to priority for the full cost of demobilization because Whistler "induced" the method of demobilization. This is a step too far. Once Whistler rejected the

---

[9] Although Nabors installed cranes for Whistler, the record indicates that it was paid for these services. Nabors also represents that it demobilized third-party contractor equipment, but it has not shown that this demobilization benefited Whistler. Whistler represents that the third-party contractors were responsible for compensating Nabors for this work.

No. 18-30940

drilling contract, demobilization was the natural and necessary consequence. Although the debtor-in-possession may have induced the timing or specific manner in which Nabors demobilized, the underlying need for demobilization arose out of the pre-petition contract. We thus perceive no error in the bankruptcy court's denial of Nabors's claim for administrative expenses related to demobilization.

V.

We REVERSE the judgment of the district court, VACATE the order of the bankruptcy court, and REMAND to the bankruptcy court for further proceedings not inconsistent with this opinion.