**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-3492
_____

IN RE: ENERGY FUTURE HOLDINGS CORP., aka TXU
Corp.; aka TXU Corp; aka Texas Utilities, et al.,
Debtors


NextEra Energy, Inc.,
Appellant
_____

On Appeal from the District Court
for the District of Delaware
(D.C. No. 1-18-cv-01253)
District Judge:  Hon. Richard G. Andrews
_____

Argued July 2, 2020

Before: KRAUSE, PHIPPS, *Circuit Judges*, and
BEETLESTONE,[*] *District Judge*.

(Filed: March 15, 2021)

_____

[*] Honorable Wendy Beetlestone, United States District Court
for the Eastern District of Pennsylvania, sitting by designation.

_____

**OPINION**

_____

James P. Bonner **[ARGUED]**
Joshua D. Glatter
Fleischman Bonner & Rocco
447 Springfield Avenue
2nd Floor
Summit, NJ 07901
Keith M. Fleischman
Fleischman Bonner & Rocco
81 Main Street
Suite 515
White Plains, NY 10601

Matthew B. McGuire
Landis Rath & Cobb
919 Market Street
Suite 1800, P.O. Box 2087
Wilmington, DE 19801
        *Counsel for Appellant NextEra Energy Inc.*

Daniel G. Egan
Gregg M. Galardi **[ARGUED]**
Ropes & Gray
1211 Avenue of the Americas
New York, NY 10036

Jonathan R. Ference-Burke
Douglas H. Hallward-Driemeier

2

Ropes & Gray
2009 Pennsylvania Avenue, N.W.
Suite 1200
Washington, DC 20006
>    *Counsel for Appellees Elliott Associates LP, Elliott
>    International LP, Liverpool Limited Partnership, UMB
>    Bank NA*

Daniel J. DeFranceschi
Jason M. Madron
Richards Layton & Finger
920 North King Street
One Rodney Square
Wilmington, DE 19801

Mark E. McKane **[ARGUED]**
Kirkland & Ellis
555 California Street
Suite 2700
San Francisco, CA 94104
>    *Counsel for Appellee EFH Plan Administrator Board*

BEETLESTONE, *District Judge*.

This case arises from the bankruptcy of Energy Future Holdings and its affiliates ("EFH" or "Debtors"). The Debtors' most valuable asset was a significant economic interest in Texas' largest electric and power transmission and distribution company, which NextEra Energy Inc. ("NextEra"), the Appellant here, agreed to buy through a Merger Agreement. Why the sale did not go through will be explained more fully below, but suffice it to say for now that it did not. The issue

before us is whether NextEra should be paid for the work it did in trying to consummate the deal.

This is the second time that NextEra has come to us requesting compensation for its efforts under the Merger Agreement. The first time, it sought payment of a $275 million Termination Fee, but we agreed with the Bankruptcy Court that it could not recover that fee. Now, NextEra seeks to recover approximately $60 million in administrative fees pursuant to 11 U.S.C. § 503(b)(1)(A), *inter alia*. The Appellees contend that the Merger Agreement requires the parties to bear their own expenses, including the $60 million sought by NextEra. We consider these arguments below.

## I. BACKGROUND

### A. The Merger Agreement and Its Termination

The procedural history that brings this matter to us is labyrinthine—but a brief recitation is necessary to understand the questions before us. On April 29, 2014, Debtors filed for Chapter 11 bankruptcy. At the time, Debtors owned an 80 percent indirect economic interest in Oncor Electric Delivery Company LLC ("Oncor"), Texas's largest electric power transmission and distribution company, which had avoided going into bankruptcy with Debtors. Oncor is subject to the regulatory control of the Public Utility Commission of Texas ("PUCT"), which, in 2007, placed what is known as a "ring fence" around Oncor. A ring fence essentially serves as a barrier around portions of a company's assets in order to ameliorate risk. The ring fence around Oncor provided, *inter alia*, for an independent board with the sole right to determine dividends and placed restrictions on upstream distributions. One of the primary reasons for the ring fence was due to the

4

sizeable debt tied to EFH: by putting the ring fence in place, Oncor customers were protected from the risk this debt could otherwise pose. Instead, the utility would be managed by a wholly independent board not saddled with EFH's burdens.

On September 19, 2016, the Bankruptcy Court approved a proposed merger between Debtors and NextEra, which included NextEra agreeing to pay off a significant amount of Debtors' debt in return for acquiring its interest in Oncor (the "Merger Agreement" or "Agreement"). An important feature of the Agreement was Section 8.5(b), which provided for a Termination Fee of $275 million that would be payable, subject to final Bankruptcy Court approval, to NextEra if the Debtors terminated the Agreement (the "Termination Fee").

NextEra negotiated terms such that its acquisition of Oncor was subject to removal of what were labelled in the Agreement as "Burdensome Conditions." This largely refers to the PUCT-imposed ring fence. The ring fence would impact NextEra's ability to appoint or replace members of the Oncor board of directors, place independence requirements for potential board members above those imposed by the New York Stock Exchange, and prevent Oncor "from making distributions, dividends or other payments to [NextEra]." SA.110-11.

Under the Agreement, if *NextEra* terminated the Merger following a failure to obtain PUCT approval without the ring fence, it would not trigger the Termination Fee provision. However, if *Debtors* terminated the Merger following a failure to achieve PUCT approval, this would trigger payment of the Fee. This Fee would count as an administrative expense under the Bankruptcy Code. Following a hearing, the Bankruptcy

5

Court confirmed Debtors' Plan of Reorganization on February 17, 2016.

On October 31, 2016, Oncor and NextEra filed an application with PUCT seeking approval of the Merger without the ring fence. On April 13, 2017, PUCT denied the application, citing as one of the key reasons for the denial that the ring fence protected ratepayers from the possible consequences of Debtors' bankruptcy. Following the denial, NextEra filed two motions for rehearing with PUCT (supported by amicus briefs from Debtors), both of which were denied. NextEra was entitled under the terms of the Agreement to terminate the Agreement following PUCT's denial, but it chose not to. Rather, it filed an appeal in Texas state court. *See In re Energy Future Holdings Corp.*, 2019 WL 4751568, at *3 (D. Del. Sept. 30, 2019).

On July 7, 2017, while the state court appeal was pending, Debtors terminated the Merger Agreement. Six weeks later, the Bankruptcy Court approved a merger between Debtors and another entity—Sempra Energy—a deal it confirmed on February 27, 2018. The price paid by Sempra was approximately $9.45 billion, several hundred million less than the approximately $9.8 billion NextEra had agreed to pay. A significant difference between the deal terms was that the Sempra merger agreement allowed for the ring fence to stay in place.

## B. The Application for the Termination Fee and Motion for Reconsideration

On July 29, 2017, following the termination of the Merger Agreement, creditors Elliott Associates, L.P., Elliott International, L.P., and the Liverpool Limited Partnership

6

(collectively, "Elliott") moved for the Bankruptcy Court, pursuant to Federal Rule of Bankruptcy Procedure 9024, to reconsider its initial approval of the Termination Fee. Elliot argued that, in approving the Merger Agreement, the Bankruptcy Court had not understood that NextEra had no incentive to terminate the Merger Agreement if PUCT did not approve the Oncor deal. To the contrary, it had every incentive not to, in that if it terminated the Agreement, it would not receive the Termination Fee, but if it waited for Debtors to terminate, it would. Opposing the motion, NextEra filed an application for payment of the Termination Fee (the "Expense Application" or "Application").

Following a hearing, the Bankruptcy Court granted Elliott's motion for reconsideration and modified the Termination Fee provision. *In re Energy Future Holdings Corp.*, 575 B.R. 616, 637 (Bankr. D. Del. 2017), *aff'd*, 904 F.3d 298 (3d Cir. 2018). Setting the lens through which it was to review the motion for reconsideration as to "correct manifest errors of law or fact or to present newly discovered evidence," *id.* at 630 (quoting *Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999)), the Bankruptcy Court focused on the September 19, 2016 hearing, in which it had considered the Merger Agreement. During that hearing, the court asked a direct question regarding whether the Termination Fee would be payable in the event PUCT denied approval. *In re Energy Future Holdings Corp.*, 575 B.R. at 632. Looking back at the transcript of the hearing, the Bankruptcy Court realized that the parties' answer to the question had not been clear, and that lack of clarity led it to have a subjective misunderstanding regarding the operation of the Termination Fee. In its opinion granting the motion for reconsideration, the Bankruptcy Court explained that:

The Court had a fundamental misunderstanding of the critical facts when it approved the Termination Fee. Despite the Court's direct question as to whether the Termination Fee would be payable if the PUCT declined to approve the NextEra Transaction, the record is incomplete and confusing on that fundamental point. The Court simply did not understand that if the PUCT declined to approve the NextEra Transaction and the Debtors (as opposed to NextEra) terminated the Merger Agreement the Termination Fee would be payable to NextEra. Despite the obvious confusion on this point neither the Debtors nor NextEra sought to clarify the record and affirmatively state that NextEra would receive the Termination Fee if the Debtors terminated the Merger Agreement. . . .

The confusing record was critical because in combination with another fact that was not mentioned, *i.e.,* the Merger Agreement had no time limit, the reality was that ***under no foreseeable circumstances would NextEra terminate the Merger Agreement if the PUCT declined to approve the NextEra Transaction***. Why? Because NextEra had the ability to hold out and to pursue numerous motions for reconsideration and a fruitless appeal until the Debtors were forced by economic circumstances to terminate the Merger Agreement, which is exactly what occurred. If the Court had understood these critical facts it would not have approved this provision of the Termination Fee.

8

*Id.* at 632-33 (emphasis in original). With these findings in mind, the Bankruptcy Court determined that the interest in justice outweighed the interest in finality, *id.* at 636-37, and accordingly amended the relevant text of the Approval Order to read:

> The Termination Fee, upon the terms and conditions of the Merger Agreement, is approved in part and disallowed in part. The Termination Fee is disallowed in the event that the PUCT declines to approve the transaction contemplated in the Merger Agreement and, as a result, the Merger Agreement is terminated, regardless of whether the Debtors or NextEra subsequently terminates the Merger Agreement. . . .

A.552. Finally, the court noted that "[n]othing in this Order shall preclude NextEra from filing a request for allowance of an administrative claim (on a ground other than the grounds on which the Termination Fee was denied in the Opinion and this Order) and any person's right to object to any such request." A.553.

NextEra appealed the Bankruptcy Court decision to the Third Circuit. The Third Circuit affirmed. *In re Energy Future Holdings Corp.*, 904 F.3d 298 (3d Cir. 2018) ("*EFH I*"). Reviewing for an abuse of discretion, the Court upheld the Bankruptcy Court's decision. *Id.* at 308. Addressing the legal relevance of the Bankruptcy Court's misunderstanding, the Court recounted that under *In re O'Brien Envt'l Energy, Inc.*, 181 F.3d 527, 532 (3d Cir. 1999), and *In re Reliant Energy Channelview LP*, 594 F.3d 200, 207 (3d Cir. 2010), termination fees may be allowed as administrative expense, *see* 11 U.S.C. § 503(b)(1)(A), to promote more competitive and

9

reliable bidding. *See EFH I*, 904 F.3d at 313-14. Nevertheless, the determination of a conferred benefit is decided by the totality of the circumstances. *Id.* at 314. Accordingly, while the Merger Agreement's Termination Fee conferred a benefit by inducing the highest bid from NextEra, it was not designed to produce a benefit to the competitive process. *Id.* at 314-15. Furthermore, the Fee carried a perverse incentive that would allow NextEra to avoid compromising on its positions and force Debtors to terminate and still pay the Fee. *Id.* at 315. Following this ruling, NextEra's appeals for rehearing en banc and a request for certiorari to the Supreme Court were both denied. *EFH I*, 904 F.3d 298 (3d Cir. 2018), *cert. denied sub nom. NextEra Energy, Inc. v. Elliott Assocs., L.P.*, 139 S. Ct. 1620 (2019).

### C. NextEra's Application for Alternative Administrative Expenses

While the appeal of the motion for reconsideration was pending before the Third Circuit, in a separate effort to get paid for its work on the Merger Agreement, NextEra filed with the Bankruptcy Court an Expense Application under Section 503(b)(1)(A) of the Bankruptcy Code to "recover its out-of-pocket expenses and other costs incurred in its efforts to complete the transaction, obtain the requisite regulatory approvals, and complete the acquisition of Debtors' Oncor assets from the time the Merger Agreement was executed until the Debtors gave notice of termination." A.583; A.562-63.

In response, Elliott and UMB Bank, as the indentured trustee, filed a motion to dismiss or, in the alternative, a motion for summary judgment to deny NextEra's Expense Application. The Bankruptcy Court held a hearing on the Application, and then, subsequently, granted the motion to

dismiss. *In re Energy Future Holdings Corp.*, 588 B.R. 371, 386 (Bankr. D. Del. 2018), *aff'd sub nom. In re Energy Future Holdings Corp.*, 2019 WL 4751568 (D. Del. Sept. 30, 2019). In doing so, it first rejected NextEra's proposed analogy to *In re Women First Healthcare, Inc.*, 332 B.R. 115, 121 (Bankr. D. Del. 2005), in which administrative fees were awarded to an ultimately unsuccessful bidder on a debtor's assets. *See Energy Future Holdings*, 588 B.R. at 385. The bidder in *Women First,* noted the Bankruptcy Court, was "ready, willing, and *able* to close the transaction," but was frustrated in that purpose by the debtor committing a tort—unlike NextEra, which was "*unable* (due to lack of regulatory approval) to consummate the transaction." *Id.* (emphasis in original). Further, in *Women First*, "there was a competitive bidding process" that resulted in a higher bid; in the present case, "there was no competitive bidding process and the Debtors eventually closed a transaction with Sempra for substantially less value." *Id.* The Bankruptcy Court also rejected NextEra's argument that its efforts to close the merger served as a "roadmap" for the Sempra deal, concluding that the relevant inquiry under Section 503(b)(1)(A) is "limited to whether the estate benefitted" by the actions taken, and because Debtors were "forced . . . to find an alternative transaction at far less value . . . there was no benefit to the estate." *Id.* at 386.

The Bankruptcy Court also granted the motion for summary judgment. *Id.* at 380-81. Its decision was premised on language in the Merger Agreement which provided that each party pays their own expenses, except for those fees that are recounted in "specifically enumerated sections of the Merger Agreement" or are administrative expenses addressed in Debtors' bankruptcy plan. *Id.* at 381. It concluded that, as a matter of law, NextEra's expenses fit into neither of those

11

categories, and thus the "Debtors never agreed to pay NextEra's expenses that related to obtaining regulatory approval before the PUCT." *Id.* It accordingly held that the Agreement unambiguously barred the Expense Application. *Id.* at 380.

The Delaware District Court, now informed by this Court's reconsideration ruling in *EFH I*, affirmed the Bankruptcy Court's decision. *Energy Future Holdings*, 2019 WL 4751568, at *4. Reviewing the Bankruptcy Court's dismissal *de novo*, the District Court held that NextEra failed to benefit the estate under Section 503(b)(1)(A). *Id.* at *2-*3. In doing so, it agreed with the Bankruptcy Court that *Women First* was inapposite and balanced the benefit NextEra maintained it provided by writing a "roadmap" for a successful merger against its decision to pursue what ended up as "fruitless appeals" in Texas court. *Id.* at *3. Additionally, the District Court held that nothing in *EFH I* required that an alternative reimbursement be approved. *Id.* at *4. The District Court did not address whether the Merger Agreement barred the recovery of NextEra's claimed expenses. NextEra appealed.

## II. JURISDICTION AND STANDARD OF REVIEW

The Bankruptcy Court had initial jurisdiction over this matter as it concerned the administration of the estate. 28 U.S.C. § 157(b). The District Court had jurisdiction to review NextEra's appeal under 28 U.S.C. § 158(a), and we have jurisdiction to review that final decision under 28 U.S.C. § 158(d)(1). When the District Court sits as an appellate court for the Bankruptcy Court, "our review duplicates that of the district court and we view the bankruptcy court decision unfettered by the district court's determination." *In re Brown*,

12

951 F.2d 564, 567 (3d Cir. 1991); *see also In re Hechinger Inv. Co. of Delaware*, 298 F.3d 219, 224 (3d Cir. 2002) ("Our review of the District Court's decision effectively amounts to review of the bankruptcy court's opinion in the first instance."). We review the Bankruptcy Court's "conclusions of law, including its interpretation of the Bankruptcy Code" *de novo*.[1] *In re Tribune Co.,* 972 F.3d 228, 237 (3d Cir. 2020).

---

[1] The Bankruptcy Court analyzed these motions under Federal Rules of Civil Procedure 12 and 56. There was some debate during argument over whether Rule 12(b)(6) was the proper rubric to evaluate Elliott and UMB's joint filing in opposition to the Expense Application. It was. Briefly, under bankruptcy law, there are two different types of proceedings: "contested proceedings" and "adversary proceedings." *See Matter of TransAmerican Nat. Gas Corp.*, 978 F.2d 1409, 1416 (5th Cir. 1992) (distinguishing between adversary proceedings, which are often akin to "full blown federal lawsuits within the larger bankruptcy case[,]" and contested matters, which "are generally designed for the adjudication of simple issues, often on an expedited basis" (internal quotation marks and citation omitted)). Adversary proceedings are governed by Bankruptcy Rule of Procedure 7012, whereas contested matters are generally governed by Bankruptcy Rule 9014. Regardless of whether the proceeding at issue is an adversary or contested matter, Rule 12(b)(6) applies here. Bankruptcy Rule 7012 explicitly incorporates Federal Rule 12(b)(6). Bankruptcy Rule 9014(c) likewise gives the court "discretion to apply Bankruptcy Rule 7012 [and thereby Federal Rule 12(b)(6)] to a contested matter in the interest of judicial economy and the preservation of estate resources." The Bankruptcy Court explicitly construed the motion as one made under Federal

13

Because the Bankruptcy Court granted Elliot and UMB's motion to dismiss, and in the alternative, their motion for summary judgment, both standards have application here—albeit on different issues. To survive a motion to dismiss for failure to state a claim, the Application must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted). Conclusory statements and recitations of the law are insufficient. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Generally, when deciding a motion to dismiss, only the complaint can be considered. But, "a court may properly look at public records, including judicial proceedings, in addition to the allegations in the complaint." *S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.*, 181 F.3d 410, 426 (3d Cir. 1999).

A movant is entitled to summary judgment if it "shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). Genuine issues of material fact refer to any reasonable disagreement over an outcome-determinative fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment on a matter of contract interpretation, as was granted by the Bankruptcy Court in this case, is

---

Rule 12(b)(6) "*made applicable to these proceedings pursuant to Federal Rule of Bankruptcy Procedure 7012.*" *In re Energy Future Holdings*, 588 B.R. at 378 (emphasis added). Accordingly, the appropriate standard here is that used to evaluate a motion to dismiss. *See In re Mullarkey*, 536 F.3d 215, 220 (3d Cir. 2008) (providing that a motion to dismiss pursuant to Bankruptcy Rule 7012 is governed by standard plausibility requirements).

appropriate only if the contract is unambiguous, *i.e.*, if it can be reasonably read in only one way. *Tigg Corp. v. Dow Corning Corp.*, 822 F.2d 358, 361 (3d Cir. 1987) (citing *Landtect Corp. v. State Mut. Life Assur. Co.*, 605 F.2d 75, 79 (3d Cir.1979)); *see also JFE Steel Corp. v. ICI Americas, Inc.*, 797 F. Supp. 2d 452, 469 (D. Del. 2011) ("If a contract is unambiguous, the Court should interpret it as a matter of law, making summary judgment potentially appropriate." (citation omitted)).

## III. DISCUSSION

### A. Potential Non-Statutory Grounds for Relief

Although NextEra filed its Expense Application pursuant to a specific statutory provision, 11 U.S.C. § 503(b)(1)(A), the operation of which we shall discuss *infra*, it also raises three alternative grounds for relief, apart from the statutory text. First, it argues that, by denying its Application, the District Court contravened a mandate issued by this Court in *EFH I*. The District Court expressly rejected this argument.[2] *See Energy Future Holdings Corp.*, 2019 WL 4751568, at \*4 ("The Third Circuit was not mandating that NextEra's expense application be allowed, nor was the Third Circuit concluding that, if it were not, NextEra would be prejudiced."). We join in this rejection and adopt this reasoning. *See id.*

Second, NextEra argues that, after the Bankruptcy Court invalidated the Termination Fee, the Debtors were required by Section 9.13 of the Merger Agreement to negotiate in good faith to devise an alternative arrangement that was

---

[2] Because our opinion in *EFH I* had not been issued, the Bankruptcy Court did not address this issue.

15

lawful and matched the original intent of the parties as closely as possible.[3]  Third, NextEra argues that it is entitled to fees under the Supreme Court's fundamental fairness doctrine set forth in *Reading Co. v. Brown*, 391 U.S. 471, 477-78 (1968) (holding that tort judgments stemming from the negligent actions of the bankruptcy receiver are entitled to priority as an administrative expense, thereby creating a narrow exception to the requirement that an applicant must show a benefit to the estate in order to recover administrative fees); *see also In re Phila. Newspapers, LLC*, 690 F.3d 161, 173 (3d Cir. 2012), *as corrected* (Oct. 25, 2012) ("[F]airness may call for the allowance of post-petition tort claims as administrative expenses if those claims arise from actions related to the preservation of a debtor's estate despite having no discernable benefit to the estate.").[4]

---

[3] Section 9.13 provides that, upon a determination that any term or other provision in the Agreement is found invalid or incapable of being enforced:

> [T]he parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties hereto as closely as possible in an acceptable manner to the end that the transactions contemplated by this Agreement are fulfilled to the extent possible.

SA.146.  Pursuant to Section 9.1 of the Agreement, Section 9.13 survives the termination of the contract and is therefore still in effect.

[4] According to NextEra, it would be fundamentally

16

Despite multiple opportunities to raise these arguments in the Bankruptcy and District Court, NextEra raises both for the first time on appeal.[5] Consequently, neither the Bankruptcy

unfair if it could not recover for the expenses it incurred seeking approval of the Merger, when it was relying in good faith on the existence of a Termination Fee in the event Debtors terminated the contract. Using the language of torts, on appeal NextEra argues that "the Debtors' inequitable, improper conduct—whether seen as negligent misrepresentation, malpractice, or a contractual breach—caused NextEra to suffer massive losses pursuing the Merger's consummation." Appellant's Br. 39. Yet, NextEra's Expense Application does not cite to *Reading*, and neither the Application nor the briefing to the Bankruptcy or the District Court mentions these purported post-petition torts. In fact, the Bankruptcy Court noted that "there are no allegations of 'unique circumstances' of a postpetition tort committed by the Debtors that would call into play the fundamental fairness doctrine relied on in *Women First*." *In re Energy Future Holdings*, 588 B.R. at 386. NextEra failed to challenge this decision in the District Court, instead affirming that it was bringing a statutory claim, not a *Reading* claim. Consistent with NextEra's briefing, the District Court made no mention of a fundamental fairness argument at all.

[5] The parties discussed Section 9.13 in their District Court briefing only in the context of whether the Termination Fee provision was severable from the rest of the Agreement, and not in reference to the duty to re-negotiate. *See* Appellant's Br. at 48, *Energy Future Holdings*, 2019 WL 4751568 (2019) (No. 1:18-cv-01253-RGA) (arguing that "if any of the Agreement's provisions are held invalid or unenforceable, the

Court nor the District Court addressed these grounds for relief. We therefore decline to address these issues for the first time on appeal and find both arguments waived. *See E.E.O.C. v. Kronos Inc.*, 694 F.3d 351, 370 (3d Cir. 2012) ("It is well established that arguments not raised before the District Court are waived on appeal." (quoting *DIRECTV Inc. v. Seijas*, 508 F.3d 123, 125 n.1 (3d Cir. 2007))); *Barefoot Architect, Inc. v. Bunge*, 632 F.3d 822, 835 (3d Cir. 2011) ("The waiver rule serves two purposes: ensuring that the necessary evidentiary development occurs in the trial court, and preventing surprise to the parties when a case is decided on some basis on which they have not presented argument." (citing *Hormel v. Helvering*, 312 U.S. 552, 556 (1941))).

## B. NextEra's Application for Section 503(b)(1)(A) Expenses

We now turn to consideration of the ground for relief that NextEra did properly raise in its Expense Application:

---

remainder of the Agreement remains in place *only* 'so long as the economic or legal substance of the transactions contemplated by this Agreement is not affected in any manner materially adverse to any party'"); Joint Brief of Appellees at 26 n.6, *Energy Future Holdings*, 2019 WL 4751568 (2019) (No. 1:18-cv-01253-RGA) (arguing that "the severability clause in Section 9.13 does not support NextEra's argument [because the] Bankruptcy Court did not render any provision of the Merger Agreement invalid, illegal, or incapable of being enforced"). Moreover, there is nothing in the record to show why, despite almost two years passing since the *EFH I* decision, NextEra never invoked this provision or exercised its *own* duty to re-negotiate.

administrative expenses pursuant to Section 503(b)(1)(A) of the Bankruptcy Code. But before delving into the statutory requirements, there is one more issue of which we must dispose—whether the Merger Agreement itself precludes recovery of any administrative fees.

### 1. Section 6.7 of the Agreement's Alleged Bar on Fees

Appellees argue that when NextEra entered into the Merger Agreement, it bargained away, in Section 6.7, any rights it may have had to recover general administrative fees. The District Court did not address this argument. However, the Bankruptcy Court granted summary judgment on this ground as an alternative to the grant of motion to dismiss, *In re Future Holdings*, 588 B.R. at 381, meaning we can properly consider it, *see In re G-I Holdings, Inc*., 755 F.3d 195, 207 (3d Cir. 2014). NextEra argued to the Bankruptcy Court that Section 6.7 differentiates between expenses that qualify as administrative expenses—which it contended were recoverable—and those which do not qualify as administrative expenses—which must be paid by the party that incurred them. The Bankruptcy Court disagreed, reading the Merger Agreement to unambiguously provide that the Debtors did not agree to pay expenses incurred by NextEra in seeking regulatory approval from the PUCT. *In re Energy Future Holdings*, 588 B.R. at 380-81. Specifically, the Bankruptcy Court held that the plain language of the Merger Agreement precluded recovery of the expenses NextEra seeks, because those expenses were neither specifically enumerated in the Merger Agreement, nor "administrative expenses of the Debtors" addressed in the Plan. *Id.* at 381. It found that the Merger Agreement expressly provides that "all costs and expenses incurred in connection with the Merger Agreement

19

shall be paid by the party incurring such expenses," and concluded that "NextEra can point to no contractual language on which the court may impose liability." *Id.*

As aforementioned, a grant of summary judgment on a question of contact interpretation is appropriate where the contract language in unambiguous. *See Tigg Corp.*, 822 F.2d at 361; *see also JFE Steel Corp.*, 797 F. Supp. 2d. at 469 (explaining that where "the language of the contract is unambiguous, the Court interprets the contract based on the plain meaning of the language contained on the face of the document." (internal citations omitted)). The question then is whether Section 6.7 unambiguously precludes, or allows for, NextEra to recover administrative expenses. Starting with the language of the Merger Agreement, Section 6.7 reads:

> Except as otherwise provided in Section 6.3, Section 6.18, Section 6.19, Section 6.20 and Section 6.22 *or any administrative expenses of the Debtors' estates addressed in the Plan of Reorganization*, whether or not the Merger is consummated, all costs and expenses incurred in connection with this Agreement and the Closing Date Transactions and the other transactions contemplated by this Agreement *shall be paid by the party incurring such expense*.

A.132 (emphasis added). From the plain language of the Agreement, there are two methods by which the Agreement allows recovery of expenses: if they fall into an enumerated section of the Agreement, or if they are "administrative expenses of the Debtors' estates *addressed in* the Plan of Reorganization." A.132 (emphasis added). NextEra does not contend that any of the enumerated sections apply. Thus, only

20

the latter exception is at issue. The "Plan of Reorganization"[6] refers to the Chapter 11 Bankruptcy Plan entered into by the Debtors. Thus, we must turn to the Plan to determine what administrative fees it addresses. The parties point to two sections that concern administrative expenses. First, its definitional section provides that an administrative claim is:

> [A] *Claim for costs and expenses of administration of the Estates under sections 503(b)* . . . including: (a) the actual and necessary costs and expenses incurred after the Petition Date through the Effective Date of preserving the applicable Estates and operating the businesses of the Debtors; [and] (b) Allowed Professional Fee Claims. . . ."

A.198 (emphasis added). Part (a) makes clear that the parties defined administrative claims identically to the Bankruptcy Code, *see* 11 U.S.C. § 503(b)(1)(A), and imposed no additional requirements beyond that the costs and expenses have been "actual and necessary . . . [to] preserving the applicable Estates and operating the businesses of the Debtors." A.198.

Next, Article II of the Plan provides that:

> [e]xcept as specified in this Article II, unless the Holder of *an Allowed General Administrative*

---

[6] Appellees argue that, at the outset, following the termination of the Agreement, the Plan never became effective, and "no administrative expenses were or could be paid thereunder." UMB's Br. 52. But the language of Section 6.7 puts paid to that argument, in that it provides that the clause survives "whether or not the Merger is consummated." A.132.

21

*Claim*[7] and the Debtors or the Reorganized Debtors, as applicable, agree to less favorable treatment, each Holder of an Allowed General Administrative Claim will receive, in full satisfaction of its General Administrative Claim, Cash equal to the amount of such Allowed General Administrative Claim. . . .

A.199 (emphasis added). Here, again, the parties made clear that administrative claims are defined only in accordance with § 503(b)(1)(A), which addresses "[a]llowance of administrative expenses," under the Bankruptcy Code. In other words, an administrative claim is entitled to priority payment under the Plan if it is "timely Filed by the applicable Bar Date," A.198, and allowed by the Bankruptcy Court as a claim for "actual and necessary costs and expenses . . . [to] preserving the applicable Estates and operating the businesses of the Debtors." A.198. *See Phila. Newspapers*, 690 F.3d at 172 (explaining that "'allowed administrative expenses' include those that satisfy the requirements of § 503(b)(1)(A)").

The unambiguous meaning of Section 6.7, then, is that except as specified in certain sections of the Merger Agreement, "administrative expenses of the Debtors' estates" are allowed under "the Plan of Reorganization," A.132, if determined by the Bankruptcy Court to be expenses that were "actual and necessary" to preserving the Debtors' estates.

---

[7] Neither party addresses what meaning, if any, the use of the word "general" has in this definition. It appears, however, to simply distinguish between "professional compensation," addressed in the next subsection, and all other types of compensation. A.199-200.

A.198. Only costs that do not meet the requirements of § 503(b)(1)(A) or are not otherwise enumerated in the Merger Agreement are barred by Section 6.7. Appellees' argument that NextEra waived its right to claim general administrative expenses pursuant to § 503(b)(1)(A) is contrary to the plain language of Section 6.7.

Tellingly, it is also contrary to the position consistently taken by Elliott throughout the reconsideration proceedings. Implicitly accepting those representations, the Bankruptcy Court, in granting Elliott's motion for reconsideration, specified that "[n]othing in this Order shall preclude NextEra from filing a request for allowance of an administrative claim" to seek expense reimbursement. A.553. And in affirming that order, we took as a given that NextEra's request for administrative expenses, which was pending in the Bankruptcy Court at the time of argument, would serve as "an alternative way to seek reimbursement for" the "significant amount of money [it spent] in its attempt to obtain PUCT approval." *EFH I*, 904 F.3d at 316. We therefore reject Appellees' waiver argument and enforce the plain text of the Merger Agreement and the Plan by reviewing whether NextEra's claim is allowable as a claim for actual and necessary costs and expenses of preserving the Debtors' estates.

2. NextEra Plausibly Alleged that it Benefitted the Estate

Nevertheless, the Bankruptcy Court concluded, and the District Court affirmed, in deciding the motion to dismiss that even if NextEra could seek administrative expenses under the Merger Agreement, it could not recover them under Section 503(b)(1)(A) of the Bankruptcy Code. The question thus remains as to whether NextEra plausibly alleged in its Expense

23

Application that it could recover administrative fees under Section 503(b)(1)(A) which provides in relevant part that:

> (b) After notice and a hearing, there shall be allowed, administrative expenses . . . including –
>     (1)(A) the actual, necessary costs and expenses of preserving the estate. . . .

11 U.S.C § 503(b)(1)(A). This provision allows for the collection of administrative expenses from a bankruptcy estate, *id.*, which "receive first priority in the distribution of the assets of the debtor's estate." *In re Hechinger Inv. Co. of Delaware*, 298 F.3d 219, 224 (3d Cir. 2002). Section 503(b)(1)(A) "limits recovery to those claims that are actual and necessary [to] prevent[] the estate from being consumed by administrative expenses[] and preserve[] the estate for the benefit of the creditors." *In re Marcal Paper Mills, Inc.*, 650 F.3d 311, 315 (3d Cir. 2011).

An administrative expense claim is entitled to priority under Section 503(b)(1)(A) if: (1) there was a "post-petition transaction between the claimant and the estate," and (2) those expenses yielded a "benefit to the estate." *In re Women First*, 332 B.R. at 121; *see Goody's Family Clothing*, 610 F.3d 812, 818 (3d Cir. 2010) (citing *In re Mammoth Mart, Inc.*, 536 F.2d 950, 954 (1st Cir. 1976)). The party seeking to recover expenses must "carry the heavy burden of demonstrating" that such expenses qualify as an administrative expense. *Goody's Family Clothing*, 610 F.3d at 818 (internal quotation marks and citation omitted).

The first requirement is satisfied: the Merger Agreement was a post-petition transaction. *See Hechinger*, 298 F.3d at 226 (defining post-petition transactions as

24

"services that are rendered after the commencement of the [bankruptcy] case and that are needed for the purpose of preserving the estate") (internal quotation marks omitted); *O'Brien*, 181 F.3d at 533 ("We assume that bidding at the sale of O'Brien's assets constitutes a transaction with the debtor-in-possession for purposes of § 503(b)(1)(A).").

The second requirement, that the claim applicant provided a benefit to the estate, requires further elaboration, and is the requirement over which the parties sharply disagree. The word "benefit" does not itself appear in the text of Section 503(b)(1)(A). Instead, it functions as "merely a way of testing whether a particular expense was truly 'necessary' to the estate: If it was of no 'benefit,' it cannot have been 'necessary' within the meaning of § 503(b)(1)(A)." *Matter of Whistler Energy II, L.L.C.*, 931 F.3d 432, 443 (5th Cir. 2019) (internal quotation marks and citation omitted). The benefit does not, however, "have to be substantial" to qualify. *In re Women First*, 332 B.R. at 121.

In *O'Brien*, we elucidated the concept of "benefit" under Section 503(b)(1)(A) in describing a framework for evaluating the possible beneficial acts that could justify a termination fee, *e.g.,* (1) "promot[ing] more competitive bidding" by "induc[ing] an initial bid" or "inducing a bid that otherwise would not have been made and without which bidding would have been limited"; and, (2) "encourag[ing] a prospective bidder to do the due diligence" to "research the value of the debtor and convert that value to a dollar figure on which other bidders can rely, . . . [which] increas[es] the likelihood that the price at which the debtor is sold will reflect its true worth." *O'Brien,* 181 F.3d at 535, 537. This articulation of what qualifies as a benefit under Section

25

503(b)(1)(A) is particularly apt where, as here, the claimant seeks reimbursement for itemized expenses incurred precisely because it "believed for roughly a year that it would be entitled to payment of the Termination Fee," *EFH I*, 904 F.3d at 316.

"Although the amount to be allowed as an administrative expense must be measured in dollars and cents . . . the question whether the estate has been benefited cannot be so narrowly confined." *Matter of TransAmerican Nat. Gas Corp.*, 978 F.2d 1409, 1420 (5th Cir. 1992). That is because the concept of "necessary costs" in the 503(b)(1)(A) context is broader than one of absolute requirement, and "less readily calculable benefits, such as the ability to conduct business as usual," can qualify. *Id.* at 1416; *see also Pennsylvania Dep't of Envt'l Res. v. Tri-State Clinical Labs., Inc.*, 178 F.3d 685, 689-90 (3d Cir. 1999) (providing that "usual and necessary costs should include costs ordinarily incident to operation of a business, and not be limited to costs without which rehabilitation would be impossible") (internal quotation marks and citation omitted). The benefit analysis—a judicial gloss on the underlying statutory concept of what is necessary— must reflect this broader conception of necessity. *See Matter of H.L.S. Energy Co., Inc.,* 151 F.3d 434, 438 (5th Cir. 1998).

Nevertheless, the benefit must be *actual*, not hypothetical. *See In re Cont'l Airlines, Inc.*, 146 B.R. 520, 526 (Bankr. D. Del. 1992). This addresses the concern that administrative claims deplete the bankruptcy estate's assets; thus, the benefit must be real in order for the claim to receive priority. *Id.* The question is "not whether [the creditor] deserves to get paid, but whether [it] deserves to get paid at the expense of [the debtor's] existing unsecured creditors." *Whistler Energy*, 931 F.3d at 441 (internal quotation marks and

citation omitted) (alteration in original). The focus is thus on the "benefit to the estate, not the loss to the creditor." *Id.* at 443. Thus, requested claims must be reasonable—as it is "axiomatic that unreasonable expenses . . . would never be necessary." *In re Express One Int'l, Inc*., 217 B.R. 207, 211 (Bankr. E.D. Tex. 1998).

To ensure those expenses are reasonable, an analysis as to whether a particular action benefitted an estate must weigh the costs to the estate against the alleged benefits.[8] *See EFH I*, 904 F.3d at 314 (noting that, when the Bankruptcy Court initially decided whether to approve the Termination Fee, it "failed to weigh" the "potential harm to the estates against the potential benefits" because it did not realize the Termination

---

[8] Under its traditional equitable powers, the Bankruptcy Court is entitled to consider the equities to NextEra as part of its balancing of the benefit and costs to the estate. *See Pepper v. Litton*, 308 U.S. 295, 307-08 (1939) (explaining that "the bankruptcy court in passing on allowance of claims sits as a court of equity" and that "in the exercise of its equitable jurisdiction the bankruptcy court has the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estate."); *In re Kaiser Aluminum Corp.,* 456 F.3d 328, 340 (3d Cir. 2006) ("[T]he bankruptcy courts have broad authority to act in a manner that will prevent injustice or unfairness in the administration of bankruptcy estates."). Specifically, the Bankruptcy Court ought to consider in its balancing, the fairness—or lack thereof—of NextEra being induced by the assurance of a Termination Fee to make the substantial outlays it did, only, when all was said and done, to lose out not only on the deal but also on the Termination Fee.

Fee could be payable in the event PUCT approval was denied); *see also* William L. Norton III, *Norton Bankr. Law & Practice* § 49:19 (3d ed. 2020) ("In general, judicial examination of any claimed expense will consider whether the value of the estate or the business was enhanced or protected by the expense; whether the expense was an unavoidable cost of operating, marshalling, or liquidating the estate; and *whether the expense was cost-effective in light of the circumstances*.") (emphasis added) (citation omitted).  As a result, to plead entitlement to administrative fees, NextEra must plausibly allege that it "provide[d] some benefit to the debtor's estate."  *O'Brien,* 181 F.3d at 536.

### a.  Determining Benefit to the Estate[9]

---

[9] At the outset, we reject Appellees' contention that NextEra is estopped from arguing that its actions in pursuing PUCT approval benefitted the estate because this Court, in *EFH I*, affirmed the determination that the Termination Fee did not produce a benefit for the estate.  For collateral estoppel to apply, the "identical" issue must have been: (1) actually litigated; (2) previously determined; and (3) necessary to the previous judgment.  *See Raytech Corp. v. White*, 54 F.3d 187, 190 (3d Cir. 1995).  Prior to *EFH I*, the Bankruptcy Court was tasked with determining whether the Termination Fee, if correctly understood at the time it was approved, produced a benefit to the estate under Section 503(b)(1)(A) (*e.g.*, whether the scope and existence of the fee when the parties entered the contract was beneficial).  *See EFH I*, 904 F.3d at 313-15; *see also In re Energy Future Holdings*, 575 B.R. at 633-35.  Here, in contrast, the Bankruptcy Court was tasked with determining if Appellants' efforts taken to consummate the merger

28

i.　　The Role of Hindsight

The Bankruptcy and District Courts held, as a matter of law, that NextEra did not provide any benefit to the estate. *In re Energy Future Holdings*, 588 B.R. at 386; *Energy Future Holdings*, 2019 WL 4751568, at \*3. NextEra argues that, in doing so, the courts erroneously measured benefit using hindsight, instead of measuring the benefit when the expenditures occurred. We, however, see no error in this aspect of the decision. In fact, in the primary case on which Next Era relies, *Women First*, the court made its decision about whether the claimant's actions benefitted the estate with the benefit of hindsight about the auction's end results, distinguishing between actions that turned out to be beneficial (such as the expense applicant's efforts to close a deal with the debtors) and actions that turned out to be harmful (such as its opposition to re-opening the auction, which delayed resolution of the claim). *See In re Women First*, 332 B.R. at 122-23. And, *Women First* is not alone in supporting the proposition that, in accordance with the policy of limiting administrative expenses,

provided a benefit worthy of administrative expense reimbursement *wholly apart* from any Termination Fee. As discussed *infra*, this entails an analysis of whether NextEra's actions after signing the Agreement created a benefit (*e.g.*, whether the steps NextEra took to secure PUCT approval were beneficial). While both inquiries rely on *O'Brien*—because *O'Brien* incorporated a benefit analysis into the determination of whether a party is entitled to a break-up or termination fee— the inquiries are separate and distinct. *See O'Brien*, 181 F.3d at 536. Accordingly, the issues are not identical, and the present issue was neither actually litigated nor previously determined. *See Raytech*, 54 F.3d at 190.

a hindsight-based analysis of the benefit to the estate requirement is appropriate. For example, in *Goody's Family Clothing*, we required a claimant landlord to "'demonstrat[e] that the ['stub rent'] for which [they] seek[] payment *provided an actual benefit to the estate* and that [incurring 'stub rent' was] necessary to preserve the value of the estate assets.'" 610 F.3d at 818 (emphasis added) (quoting *O'Brien*, 181 F.3d at 533).[10] It is accordingly entirely appropriate to consider, as viewed through the rearview mirror, whether the expenses of NextEra provided an actual benefit to the estate.

      ii.        The Plausibility of NextEra's Alleged Benefits

NextEra offers two main arguments to support its assertion that it benefitted the bankruptcy estate. It asserts that its bid encouraged later, higher bidders—in other words, that it acted as a "stalking horse"—and also that it created a roadmap that assisted in and sped up the approval of the Sempra merger.

We turn first to the "stalking horse" theory. A stalking horse refers to an entity that is willing to place a bid on a debtor's asset in order to either set a baseline bid from which the true value of the estate can be assessed or serve as a catalyst to inspire other bidders. *See In re Integrated Res., Inc.*, 135 B.R. 746, 750 (Bankr. S.D.N.Y.), *aff'd*, 147 B.R. 650

---

[10] Although NextEra is correct that this Court, in *EFH I*, "assess[ed the] propriety of termination fee as of the date of Bankruptcy Court approval," Appellant's Br. 44, it was doing so on a motion for reconsideration of *approval of a contract provision* that it read as providing for a future administrative expense provision rather than *ruling on the actual application for an administrative expense* (like the current matter). *See EFH I*, 904 F.3d at 313-16.

(S.D.N.Y. 1992); *O'Brien*, 181 F.3d at 537. NextEra points to the Termination Fee—a common feature used to induce a stalking horse—as evidence in support of this contention. *See In re Integrated Res.*, 135 B.R. at 750. Apart from the Termination Fee, however, NextEra was not a prototypical stalking horse. NextEra did not serve as a catalyst for other bidders at the time of its bid; its bid was the sole offer. *Id.* (defining a stalking horse as an entity that offers "an initial bid that is then 'shopped around' to attract higher offers" (citation omitted)). Moreover, Debtors later accepted a substantially lower bid after the Merger Agreement fell through. *See In re AE Liquidation, Inc.*, 866 F.3d 515, 519 n.3 (3d Cir. 2017) (stalking horse entity "enter[s] into an asset purchase agreement with the debtor . . . prior to an auction" and "establish[es] a competitive floor or minimum bid" (citation omitted)). However, as NextEra notes, the later bid was for Oncor with the undesirable ring fence intact, and was therefore a bid on a different bag of goods. So we are left to compare apples to oranges: the value of Oncor without the ring fence (what NextEra bid on) to the value of Oncor with the ring fence intact (what Sempra purchased).

Although NextEra did not, on this record, plausibly allege that it "induce[d] an initial bid" or "promoted more competitive bidding," *O'Brien,* 181 F.3d at 535, 537, as a stalking horse bidder which was outbid by higher bidders,[11] it

---

[11] We need not and do not decide the parameters of what constitutes a stalking horse for the purposes of a claim for administrative fees. We simply reject the rigid notion that a stalking horse only provides a benefit to the estate where it drives up the bidding price. That Debtors eventually accepted

31

has plausibly alleged that it performed "due diligence" in pursuing PUCT approval of a sale without the ring fence attached, "increasing the likelihood that the price at which the debtor['s asset] is sold will reflect its true worth." *Id.* Specifically, prior to NextEra taking the risk of bidding and seeking approval without the ring fence, and its attempts to appeal the denial, it appears from the Expense Application that no bidders were willing to bid on Oncor *with* the ring fence in place.[12] After NextEra's efforts to consummate the Merger (and its showing that it could only occur with the Burdensome Conditions intact), however, Debtors were able to find bidders willing to accept a merger with the ring fence. It was NextEra's ultimately unsuccessful efforts towards consummating the merger without the ring fence that provided future bidders with the necessary information to place informed bids, with the understanding that the ring fence would remain. This is the same factual predicate as the roadmap claim, discussed *infra*, and the same benefit to the

a lower dollar deal following the termination of the Merger Agreement is not necessarily dispositive.

[12] Prior to the NextEra Agreement, Debtors entered into another agreement with a different company, the Hunt Consortium, that also failed to achieve PUCT approval, and Hunt eventually terminated. The record before us does not reveal what, precisely, lead to its rejection, other than noting that the PUCT order contained "certain required commitments for Oncor and the Hunt Consortium" the parties were not willing to make. A.71. Taking all inferences in NextEra's favor, it appears the Hunt Consortium was similarly unwilling to take on Oncor unless certain restrictions were lifted, but was unwilling to pursue their removal, as NextEra did.

estate. The theories are therefore not analytically distinct. Since NextEra essentially alleges that it served as a stalking horse by providing a roadmap for future bids, we will focus our analysis on whether NextEra plausibly alleges a benefit under the purported roadmap theory.

NextEra's roadmap argument is that by negotiating the Merger Agreement and Plan, and by settling objections with creditors as well as by providing further due diligence, it created guideposts that directly facilitated the Sempra merger. This argument is predicated on the idea that, by going as far as it did along the route to purchase the Debtors' interest in Oncor, NextEra provided the estate with valuable knowledge and strategic documents that inured to the benefit of the Debtors in the Sempra sale. In NextEra's words, its "due diligence de-risked the Sempra Transaction, demonstrated and expedited the path to closing, and allowed Sempra to offer an improved price." Appellant's Br. 46.

NextEra plausibly contends that its labor in drafting the Merger Agreement and Plan (later relied upon in the Sempra deal), settling with creditors objecting to the merger, and proving to future bidders that Debtors' interest in Oncor would necessarily have the Burdensome Conditions attached saved Debtors from reinventing the wheel even after the deal with NextEra fell through. These arguments find support in the record. Motions for Bankruptcy Court approval of subsequent mergers reflect that "[l]earning from past successes and obstacles . . . , the Debtors fought for a number of significant concessions from [an intervening bidder in between NextEra and Sempra], including . . . [the bidder's] agreement to take the ring fence 'as is, where is.'" A.270. Sempra also agreed to preserve key aspects of the ring fence to "mitigate the risk that

33

the PUCT will not approve the transactions." A.307. Additionally, the intervening bidder was "willing[] to largely preserve the structure of the [NextEra] Plan (which simplified the negotiation and documentation process)," A.278, and the Sempra Merger Agreement, in turn, was "substantially similar," A.299, to the intervening bidder's. In this same vein, the intervening bidder "agreed to largely preserve the EFH Committee Settlement," "with essentially the same legal and economic structure as the [NextEra] Plan," to "mitigate[] Plan confirmation risk." A.284-85. Where the "record evidence" indicates that Debtors reaped the benefits of NextEra's PUCT experience and its efforts to draft key documents, we cannot agree with the Bankruptcy and District Courts' decisions that these costs were not plausibly "necessary to preserve the value of [Debtors'] estate." *O'Brien*, 181 F.3d at 536.

Here, NextEra's claimed expenses related to its services[13] including, for example, "ongoing work on the transaction itself, including work performed . . . on plan confirmation and the confirmation hearing," "fees for confirmation-related discovery, work related to the

---

[13] NextEra describes its services as "market valued at $275 million." Appellant's Br. 23. This figure appears to refer to the Termination Fee. However, as a general matter, Termination Fees are meant to account for the risk associated with mergers rather than be an accurate valuation of merger-related services. *See O'Brien*, 181 F.3d at 533 (explaining that in the context of non-bankruptcy mergers, Termination Fees are used to compensate for risks a "white knight" bidder would undertake by entering the bidding). Thus, the size of the Termination Fee is not, absent more, an appropriate guide to the value of the benefits to the estate.

34

confirmation hearing, and other work necessary to bring the transaction to a close," at a cost of $10,404,341. A.588. In addition, it accounted for "work performed on the PUCT approval process, including principally legal counsel, advisor and expert work in connection with the PUCT application and approval process," listing the cost as $8,110,331. A.589. Finally, it calculated the cost of "public outreach efforts to promote the transaction and facilitate regulatory approval, including PUCT approval" at $1,691,297. A.589-90. These costs, while not an exclusive account of what may qualify as administrative expenses, all would appear to relate to the cost of obtaining information that may have later helped the Debtors. At base, any award of administrative expenses for benefits provided to the estate must be consistent with Section 503(b)(1)(A)'s mandate that NextEra can recover only for those "actual and necessary costs and expenses of preserving the estate," 11 U.S.C. § 503(b)(1)(A).

But then comes another tricky question: how are these benefits to be weighed against the alleged costs to the estate attributable to NextEra, in order to determine if the overall benefit was *actual*? The key principles underlying the benefit analysis, discussed *supra*, are likewise relevant to this analysis, namely that our consideration "cannot be so narrowly construed" as to consider only expenses that can be "measured in dollars and cents," *TransAmerican*, 978 F.2d at 1420, but we must nonetheless ensure that the costs for which NextEra seeks to recover reflect a reasonable expense worthy of getting "paid at the expense of [the debtor's] existing unsecured creditors." *Whistler Energy*, 931 F.3d at 441 (internal quotation marks and citation omitted); *see also In re Express One*, 217 B.R. at 211 (noting that "unreasonable expenses" cannot qualify as an administrative expense).

35

To this point, Appellees contend that, while NextEra pursued allegedly "fruitless" appeals before PUCT and in Texas state court, the estate incurred $50 million in interest expenses per month, totaling, at a minimum, $250 million. Elliott Br. 22, 29. The District Court agreed and held that *any* benefit NextEra may have alleged outweighs the costs imposed to the estate while it was pursuing these "fruitless" appeals. *Energy Future Holdings*, 2019 WL 4751568, at *3. NextEra disputes both premises of the District Court's conclusions. As to the calculation of interest, it argues that the $50 million a month figure has no basis in fact. And more specifically, as NextEra correctly points out, this calculation was not offset by Oncor revenues Debtors received during the appeals period, thus meaning it might not reflect any net loss. On the other hand, it is not contested that the Debtors' financial obligations did compound at least to some degree during the time NextEra was seeking the PUCT's approval. Thus, it remains an unsettled fact issue as to the net loss from interest expenses the Estate incurred as a result of NextEra's continued pursuing of PUCT approval.

Turning to the supposed fruitlessness of the appeals, NextEra first argues that the "Debtors fully endorsed every argument that NextEra made in support of reversing the PUCT." Appellant's Br. 50. NextEra is correct in this assertion. It lends support to NextEra's roadmap claim—that the Debtors consented indicates that they, too, preferred a merger without the ring fence, rather than with it. And this may be probative evidence that the appeals were, in fact, not fruitless, but instead were valid attempts to secure PUCT approval supported by all involved parties. In such an instance, the accumulated interest may more readily reflect what is simply a necessary cost incident to doing business, making it,

36

in whole or at least in part, inappropriate to debit against NextEra. *Cf. Tri-State*, 178 F.3d at 689-90.

NextEra next contends that the Merger Agreement *required* NextEra to pursue the reconsideration motions and appeal—and thus it would be wrong to consider the appeals "fruitless." Appellant's Br. 50; A.124-25. The Agreement does not, however, specifically require all appeals be pursued; instead, it requires "reasonable best efforts" to obtain the PUCT's approval. A.124-25. However, it is a question of fact that cannot be decided from the record before us as to whether the appeals of the PUCT decisions fell within the "reasonable best efforts" anticipated by the Merger Agreement. If it is found that NextEra was in fact fulfilling contractual duties by pursuing some or all of the appeals, this too may cut against holding the interest costs against it. *See In re Women First*, 332 B.R. at 122-23 (distinguishing between beneficial and harmful actions depending on the timing and impact on resolution of the estate).[14]

## IV. CONCLUSION

NextEra plausibly alleged that through a post-petition

---

[14] NextEra's argument that the PUCT ruling "lacked any factual or legal basis" is neither here nor there in the present instance, Appellant's Br. 50, because federal courts do not sit as courts of appeals for state court or agency judgments and must grant preclusive effect to legally rendered decisions. *See, e.g.*, *Univ. of Tenn. v. Elliott*, 478 U.S. 788, 799 (1986) (holding that when a state agency acts in a judicial capacity, its factfinding is afforded the same preclusive effect as a state court's). Thus, this Court has no authority to question PUCT's decision.

transaction, the Merger Agreement, it benefitted the estate by providing valuable information, and accepting certain risks, that paved the way for the later Sempra deal. The precise monetary value of this benefit cannot be distilled from pleadings alone. And likewise, the costs NextEra allegedly imposed on the estate are equally uncertain. With respect to the motion to dismiss the question before us is not whether NextEra *actually* benefitted the estate, but whether it *plausibly* alleged that it did so. Accepting the Expense Application as true and taking all inferences in NextEra's favor, it has plausibly alleged that it is not foreclosed from receiving administrative expenses under Section 503(b)(1)(A). With the benefit of discovery, NextEra may (or may not) prove that the actual benefit conferred on the estate outweighed the costs it imposed, such that it is entitled to administrative fees. And as to the motion for summary judgment, although NextEra and the Debtors entered into an agreement that generally provided each party would bear its own costs, the agreement exempted from that general rule expenses addressed in the Plan of Reorganization. In turn, the Plan unambiguously provides for the recovery of administrative claims as defined by Section 503(b) of the Bankruptcy Code.

For the foregoing reasons, the orders of the Bankruptcy and District Courts are reversed. This case is remanded to the District Court so that the court may vacate its opinion affirming the Bankruptcy Court and remand to the Bankruptcy Court for further proceedings consistent with this opinion.